UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TINAMARIE CRUZ,                    :
                                   :
         Plaintiff                 :    No. 1:12-CV-00135
                                   :
      vs.                          :    (Judge Caldwell)
                                   :
CAROLYN W. COLVIN, ACTING          :
COMMISSIONER OF SOCIAL             :
SECURITY,                          :
                                   :
         Defendant                 :

FILED
HARRISBURG, PA

SEP 1 7 2013

MARY E. D'ANDREA, CLERK
Per _____
        Deputy Clerk

### MEMORANDUM AND ORDER

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Tinamarie Cruz's claim for social security disability insurance benefits and supplemental security income benefits.

Cruz protectively filed[1] an application for disability insurance benefits on August 18, 2009, and an application for supplemental security income benefits on August 19, 2009. Tr. 28, 72-73, 96-104 and 120.[2] On January 21, 2010, the Bureau of

_____

1. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on April 4, 2012.

Disability Determination[3] denied Cruz's applications. Tr. 75-84. On March 4, 2010, Cruz requested a hearing before an administrative law judge. Tr. 85. After 11 months had passed, a hearing was held on February 9, 2011. Tr. 46-71. On March 22, 2011, the administrative law judge issued a decision denying Cruz's applications. Tr. 28-41. On April 11, 2011, Cruz requested that the Appeals Council review the administrative law judge's decision and on November 25, 2011, the Appeals Council concluded that there was no basis upon which to grant Cruz's request for review. Tr. 1-7, 21-24 and 170-174. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Cruz then filed a complaint in this court on January 24, 2012. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on July 27, 2012, when Cruz filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being

---

3.   The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.   Tr. 76 and 81.

4.   Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."   M.D.Pa. Local Rule 83.40.1.

insured is commonly referred to as the "date last insured." It is undisputed that Cruz met the insured status requirements of the Social Security Act through December 31, 2012. Tr. 28, 30, 105, 120 and 161.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Cruz was born in the United States on May 3, 1971, and at all times relevant to this matter was considered a "younger individual"[5] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 50, 72-73, 98, 119, 161 and 472.

Cruz has the equivalent of a high school education and can, read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 50-51, 123, 131, 148 and 473.[6] During her

---

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing and the administrative law judge's decision Cruz was 39 years old.

6. There are conflicting statements in the record regarding
(continued...)

elementary and secondary schooling, Cruz attended regular
education classes. Tr. 131 and 473. Cruz is right-handed, has a
driver's license and drives on occasion.[7] Tr. 50-51, 148 and 150.

Cruz has past relevant employment[8] as (1) a cleaner of
laboratory equipment which was described as unskilled, medium work
by a vocational expert, (2) as a loader and unloader at a Walmart
Distribution Center which was described as semi-skilled, heavy
work, and (3) as a production line worker which was described as

---

6.   (...continued)
Cruz's education.  Cruz testified that she obtained a General
Equivalency Diploma and after doing so did not receive any
vocational training or attend college. Tr. 50.  However, in a
document filed with the Social Security Administration, Cruz
indicated that she attended one year of college with an
approximate completion date of 1987. Tr. 131.  Also, a report of
a psychological evaluation of Cruz dated December 9, 2009,
indicates that Cruz graduated from high school and attended one
semester of college. Tr. 473.

7.   As will be elaborated on below Cruz was involved in a motor
vehicle accident which resulted in injury to her left upper
extremity.  There was no lasting injury to her right upper
extremity.

8.   Past relevant employment in the present case means work
performed by Cruz during the 15 years prior to the date her claim
for disability was adjudicated by the Commissioner.  20 C.F.R. §§
404.1560 and 404.1565.

unskilled, heavy work.[9] Tr. 63-66 and 134. Cruz also worked as a waitress for various restaurants. Tr. 134.

---

9. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

Records of the Social Security Administration reveal that Cruz had earnings in the years 1987, 1988 and 1991 through 2008, a total of 20 years. Tr. 106. Cruz's average earnings during those years were $10,386.46. Id. Cruz's earnings ranged from a low of $841.97 in 2008 to a high of $25,955.09 in 2004. Id. Cruz's total earnings were $207,732.93. Id. However, according to the testimony of Cruz at the administrative hearing, the earnings in 2008 - $841.97 - were from a disability plan and she was not employed during that year. Tr. 52.

Cruz contends that she became disable on August 27, 2007. Tr. 51, 96, 119 and 124. Cruz claims that she is unable to work because of mental and physical impairments. Id. Cruz identified obsessive compulsive disorder, anxiety and dyslexia as her mental health impairments and neck, left arm, low back, and knee pain and Osgood-Schlatter disease (a painful lump below the knee cap) as her physical impairments. Tr. 51-53, 59-60 and 124. Cruz states that she cannot sit for extended periods, she walks with a cane, she cannot use her left arm and hand, she cannot lift over 5 pounds, and she has limited mobility. Id. The impetus for Cruz's disabling impairments was a motor vehicle accident that occurred on August 27, 2007, which aggravated some pre-existing conditions and resulted in new conditions. Id.; Doc. 10, Plaintiff's Brief, pp. 3-4. Cruz last worked on August 27, 2007. Tr. 124.

On August 20, 2009, Cruz was interviewed face-to-face by M. Fedoryshyn, an employee of the Social Security Administration, who observed that Cruz had difficulty sitting, standing, walking and using her hands. Tr. 121. Fedoryshyn stated that Cruz

> walk[ed] with a cane, she had to move from side to side to get comfortable during the interview. [S]he showed me the difference between her [right] and [left] arm. [S]he showed me her knee where there is a calcium deposit below the knee cap that looks like the end of a bone sticking up from her knee. She had to walk deliberately.

Tr. 122.

In a "Function Report - Adult" dated October 11, 2009, Cruz indicated that she lives in a house with her family. Tr. 145. Cruz stated that she had no problem with personal care, such as bathing and dressing. Tr. 146. Cruz in describing her daily activities noted that she does cleaning and laundry but that "[i]t usually takes a few hours because it [is] really hard [to] walk, stand and [that she] can only use her right arm." Tr. 145. Cruz stated that she prepares meals (mostly frozen items) and that she cooks less fresh foods because it is hard for her to stand. Tr. 147. Her son usually helps her with vacuuming and taking out the garbage. Tr. 145. Cruz noted that she has a difficult time sleeping. Tr. 146. Cruz stated that she does some cooking, laundry and some cleaning which does not require bending, lifting and pushing. Tr. 147. Cruz indicated that she needs encouragement to perform the housework and that her son helps her with the activities that require pushing, bending and lifting. Id. Cruz

7

goes outside once or twice a week and shops in stores for groceries once a week for about ½ hour. Tr. 148. Her hobbies include "puzzles [and] watching TV." Tr. 149. When asked to check items which are affected by her illnesses or conditions, Cruz checked lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks and using hands. Tr. 150.

In an updated report completed sometime after March 30, 2010, regarding Cruz's functional abilities Cruz indicated that her back pain was getting worse and she was having "bad" headaches and "a lot of right knee pain." Tr. 164. Cruz further stated that she had to ask for help with lifting, carrying laundry, cooking pots, sweeping, vacuuming" and that she needed a cane to walk and was "having [a lot] of troubling with pain and need[ed] help." Tr. 167. She further noted that her anxiety had increased. Tr. 165.

At the administrative hearing on February 9, 2011, Cruz testified that she takes care of her personal needs, such as bathing, grooming and dressing but that she has to have assistance when putting on her shoes. Tr. 54. Cruz does not do shopping "most of the time" but her family engages in that activity for her. Id. Her hobbies include puzzles. Id. Cruz reads magazines and watches TV. Tr. 55. Initially Cruz testified that she does the puzzles "basically [the] whole day" but additional questioning revealed that she would engage in this activity intermittently along with watching TV and preparing something to eat. Tr. 60-61.

Cruz testified that she enjoys puzzles and watching television because those activities allow her to "get out of her head" when she is feeling stressed and anxious. Id. Cruz stated that she has difficulty being around a lot people and has panic attacks. Id.

For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

## Standard of Review

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71

9

F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176
(4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529
n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565
(1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197,
229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d
198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360
(3d Cir. 1999). Substantial evidence has been described as more
than a mere scintilla of evidence but less than a preponderance.
<u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual
record substantial evidence may be "something less than the weight
of the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
<u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all
the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and
"must take into account whatever in the record fairly detracts
from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S.
474, 488 (1971). A single piece of evidence is not substantial
evidence if the Commissioner ignores countervailing evidence or
fails to resolve a conflict created by the evidence. <u>Mason</u>, 994

F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

11

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that is severe,[11] (3) has

---

10. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

11. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

(continued...)

an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other

---

11. (...continued)

12. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

13. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

The administrative record in this case is 653 pages in length and we have thoroughly reviewed that record. Before we address the administrative law judge's decision and the arguments of counsel, we will review some of the medical records. The relevant time period for review of the medical records is from August 27, 2007, the alleged disability onset date, to March 22, 2011, the date the administrative law judge issued her decision and our task is to focus on the records before the administrative law judge when assessing whether or not her decision is supported by substantial evidence.[14]

---

14. After the administrative law judge issued her decision, Cruz's attorney submitted further evidence to the Appeals Council. Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence. Matthews v. Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001). Cruz's attorney has conceded that the record submitted after the ALJ's decision should not be considered by us. See Doc. 10, Plaintiff's Brief, pp. 2-3, n. 2.

On August 27, 2007, Cruz was transported to the Pocono
Medical Center by ambulance after being involved in a motor
vehicle accident. Tr. 403-405. The accident was a low speed,
head-on-collision. Id. Cruz was the driver and wearing a safety
belt. Id. The air bag of the vehicle deployed. Id. At the
hospital, Cruz complained of pain in her knees, neck and left
elbow. Tr. 404. Cruz rated her pain as an 8 on scale of 1 to 10.
Id. Abrasions were observed on Cruz's right forearm and left side
of her neck and the left elbow was swollen. Id. It was noted that
the abrasions to the left side of the neck were caused by the
seatbelt. Id. While at the hospital several x-rays were taken,
including of Cruz's knees and left elbow. Tr. 400. The x-rays
revealed degenerative joint disease of the knees and the x-ray of
the left elbow revealed a "longitudinal fracture of the proximal
ulna extending into the ulnar aspect of the elbow joint."[15] Id.
After a physical examination was performed, a splint applied to
the left arm, and pain medications administered and prescribed,
Cruz was discharged from the hospital with instructions to wear

---

15. There are two lower arm bones, the radius and the ulna.
When the arms are at the sides of the body with palms facing
forward, the ulna is the bone closest to the center of the body
and above the little finger. The proximal ulna is the portion
closest to the elbow. The distal ulna is the portion closest to
the wrist. At one point in the emergency department records, the
injury to the left arm is described as a nondisplaced olecranon
fracture. Tr. 407. The olecranon is the bony process at the tip
of the elbow which can be clearly felt when the elbow is bent.

the splint until after following-up with Frederick Barnes, M.D., an orthopedist, located in Stroudsburg, Pennsylvania. Tr. 405-407. At the time of discharge it was observed that Cruz ambulated without assistance. Tr. 405.

On August 30, 2007, Cruz underwent a CT scan of the left upper extremity. Tr. 185, 209, and 399. The CT scan revealed a "nondisplaced intraarticular[16] fracture at the proximal ulna without dislocation." Id. The report of the CT scan further stated there was "no fracture involving the olecranon process." Id.

On August 31, 2007, Cruz underwent an MRI of the cervical spine which revealed worsening of a preexisting condition at the C6-C7 level. Tr. 179-180. Specifically, it was stated as follows: "At C6-7, there is moderate posterior disc osteophyte complex with a superimposed small broad based central disc herniation. This contacts and minimally flattens the ventral aspect of the cord at this level with no abnormal cord signal. This is markedly progressing in comparison with the prior study. There is at least a moderate left sided neural foraminal

---

16. Intraarticular is defined as "within a joint." Dorland's Illustrated Medical Dictionary, 953 (32nd Ed. 2012).

narrowing[17] at this level, which has also progressed minimally."
Tr. 180. The prior MRI was performed on May 18, 2006. Tr. 179.

The record reveals that on September 6, 2007, a
disability insurance form for Hartford Life Insurance Company was
completed on behalf of Cruz by Michael Cirone, a physician
assistant, employed by Harold Katz, M.D., a treating physician.
Tr. 237-238. That form states that Cruz suffered from a fracture
of the left elbow and would have no use of her left upper
extremity for a period of six months. Id. Mr. Cirone also
indicated that Cruz had no ability to sit, stand or walk in a
general workplace environment. Tr. 238.[18]

On September 15, 2007, Cruz had an x-ray of the left
elbow performed at Pocono Medical Center which revealed a "linear
nondisplaced fracture of the olecranon process."[19] Tr. 196, 212

---

17. Along the spinal cord there are nerves which branch off.
They carry signals to the rest of the body at each level along
the spine. The nerve roots exit through holes (foramen) in the
bone of spine on the left and the right. The narrowing of the
holes is called neural foraminal narrowing.

18. On the form there was a question as to the total number of
hours per day that Cruz could sit, stand and walk in a general
workplace environment. Tr. 238. With respect to those three items
(sitting, standing, walking), Mr. Cirone inserted the "no or
none" symbol, a circle with a diagonal line through it.

19. The individuals who interpreted the x-ray performed on the
day of the accident and on September 15, 2007, were of the
opinion that the fracture was in the olecranon process. However,
the individual interpreting the CT scan of August 30, 2007, was
(continued...)

and 399. The report of this x-ray further stated that the alignment of the fracture remained unchanged and the fracture line was still discernible. Id.

On September 17, 2007, Cruz had an appointment with Dr. Katz. Tr. 248-250. At that appointment Cruz's chief complaint was back pain and that she had to walk with a cane. Tr. 248. Cruz noted that her knees and right elbow were "feeling considerably better" but her neck and back were "hurting considerably[.]" At the time of this appointment Cruz was wearing a cast on her left arm. Tr. 249. Dr. Katz reviewed with Cruz the results of the recent CT scan of her left upper extremity. Tr. 248. Dr. Katz informed Cruz that she was "going to lose some range of motion at the elbow permanently, especially terminal extension, internal supination[.]"[20] Id. Dr. Katz also reviewed the recent MRI of

---

19. (...continued)
of the opinion that the fracture was in the base of the coronoid process of the ulna which is a bony process below the olecranon process and in the direction of the distal ulna. See Gray's Anatomy of the Human Body, Elbow Bone, http://www.bartleby. com/107/52.html (Last accessed September 9, 2013).

20. Extension is moving the arm straight out and level in front of you. Normal extension is from 150 degrees to 0 degrees. Tr. 480. If you hold the arms straight and level at your side with the fingers extended and the thumb pointed upward, supination is turning the arms so that the palms are facing upward. Normal range of supination is 80 degrees. Id. Pronation is the opposite of supination, the palms are turned downward. Normal pronation is also 80 degrees. Id.

18

Cruz's cervical spine and stated that it showed "considerable progression in comparison with her previous study" and that Cruz would again be referred to Mikhail Artamonov, M.D., a pain management specialist with Northeastern Rehabilitation & Pain Management Center, located in East Stroudsburg, Pennsylvania, and "leave it to him to decide whether she should be referred to a neurosurgeon or spine surgeon and/or what other treatments he would like to do for that." Id.

A physical examination of Cruz by Dr. Katz revealed that Cruz's neck range of motion was "considerably decreased and antalgic, and in particular she [was having] difficulty with left rotation" which gave her significant pain near the base of the skull and the "left proximal portion of the trapezoid." Id. Dr. Katz noted that Cruz had normal range of motion in her right elbow, her knees showed some scarring, there was bruising on the right knee, and she had evidence of Osgood-Schlatter disease. Id. With respect to Cruz's back pain, Dr. Katz reported that Cruz had a positive straight leg raising test[21] on the left which gave her

---

21. The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or her leg lifted. The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed September 11, 2013).

sciatica-type symptoms and that she had "marked decreased range of motion in her back and paraspinal muscle tenderness and spasm." Tr. 249.

Dr. Katz took Cruz out of the left arm cast but found that she was too tender to stay out of it so he placed her "in a 5-inch fiberglass posterior mold" extending from her knuckles to her proximal arm. Tr. 249.

Dr. Katz's diagnostic impression was that Cruz suffered from a cervical sprain; a herniated nucleus pulposus which had worsened; a right elbow sprain which was resolving; right internal derangement of the knee; Osgood-Schlatter disease with giving way; a left knee sprain which was resolving; lumbosacral sprain/sciatica with severe worsening of her previous symptoms; and a left proximal ulnar fracture. Tr. 249-250. Dr. Katz ordered additional MRIs of the left wrist and elbow and referred Cruz to physical therapy. Dr. Katz also noted that there was a possibility that Cruz suffered from a tear of the triangular fibrocartilage complex (TFCC).[22] Tr. 250.

---

22. The TFCC consists of cartilage and ligaments in the wrist area primarily on the side of the little finger. "The TFCC makes it possible for the wrist to move in six different directions (bending, straightening, twisting, side-to-side)." A Patient's Guide to Triangular Fibrocartilage Complex (TFCC) Injuries, Houston Methodist, Orthopedics and Sports Medicine, http://www.methodistorthopedics.com/triangular-fibrocartilage-complex-tfcc-injuries (Last accessed September 9, 2013).

On September 18, 2007, Cruz was examined by Dr. Artamonov who found that Cruz had "significant limited range of motion of the cervical and lumbar spine with positive facet joint loading test of the lumbar spine."[23] Tr. 441. Also, on September 18th Cruz had an x-ray of the left elbow which revealed the following: "Two view study of the left elbow demonstrates no acute fracture line. There is some minimal arthritic change involving the coronoid process of the ulna. On this limited study, no residual fracture line is identified. Position and alignment appears to be anatomic. The lateral film is not a true lateral film. Followup recommended as clinically indicated." Tr. 197, 208, 211 and 398-399.

---

23. The facet loading test is a provocative test to determine whether there is a problem with or degenerations of the facet joints. The facet joints are in the back of the spine and act like hinges for the vertebrae. There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes. "The facet joints connect the posterior elements of the [vertebrae] to one another. Like the bones that form other joints in the human body, such as the hip, knee or elbow, the articular surfaces of the facet joints are covered by a layer of smooth cartilage, surrounded by a strong capsule of ligaments, and lubricated by synovial fluid. Just like the hip and the knee, the facet joints can also become arthritic and painful, and they can be a source of back pain. The pain and discomfort that is caused by degeneration and arthritis of this part of the spine is called facet arthropathy, which simply means a disease or abnormality of the facet joints." Facet Arthropathy, Back.com, http://www.back.com/causes-mechanical-facet.html (Last accessed September 9, 2013).

An x-ray of the left elbow on October 4, 2007, revealed that "[t]he fracture of the proximal ulna [had] healed in anatomic position and alignment and no fracture line [was] present. There [was] no dislocation, arthritis or other significant osseous abnormality." Tr. 181. An x-ray of the left wrist on the same day was normal.[24] Id.

On October 4, 2007, a physical examination of Cruz by Dr. Katz revealed limited range of motion of the left elbow with respect to extension (she had 45 degrees) and flexion (she had 70 degrees) but she had "fair supination and pronation." Tr. 246. Cruz also had "tenderness and swelling along the ulnar aspect of the wrist joint." Id. Dr. Katz's diagnostic assessment was that Cruz suffered from a healing left proximal ulnar fracture and a possible tear of the TFCC. Id.

An MRI of Cruz's lumbar spine was performed on October 10, 2007, which revealed the following: "Minimal disc space narrowing and desiccation at L5-S1 with a stable central to right paracentral annular tear and tiny disc herniation without any central spinal stenosis or abutment of the S1 nerve roots within

_____

24. An x-ray does not always reveal the scope and extent of injury to both soft and hard tissues. As will be elaborated on below subsequent MRIs revealed wrist and elbow injuries.

the thecal sac/central spinal canal."[25] Tr. 182, 214-215, 226 and 398.

An MRI of the right knee on October 10, 2007, was normal. Tr. 193, 225 and 397-398.

An MRI of the left elbow on October 11, 2007, revealed the following: "Minimally displaced nonunionized intraarticular fracture at the base of the coronoid process with associated partial tear of the ulnar collateral ligament." Tr. 183, 216, 224 and 396.

An MRI of the left wrist on October 11, 2007, revealed the following: "[A] partial tear of the triangulofibrocartilage at

---

25.     The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the 24 bony vertebral bodies that make up the spinal column(if you count the fused vertebrae in the lower spine there are 33 vertebral bodies). Each disc is made of a tough outer layer and an inner core composed of a gelatin-like substance, the nucleus pulposus. The outer layer of an intervertebral disc is called the annulus fibrosus. Jill PG Urban and Sally Roberts, Degeneration of the intervertebral disc, PublicMed Central,http://www.ncbi.nlm.nih.gov/pmc/articles/ PMC165040/(Last accessed September 9, 2013); see also Herniated Intervertebral Disc Disease, Columbia University Medical Center, Department of Neurology, http://www.columbianeurosurgery.org/ conditions/herniated-intervertebral-disc-disease/ (Last accessed September 9, 2013).
     Disc dessication is when there is loss of water content or moisture in the discs, i.e., a dehydration of the discs.  When the discs dehydrate they become rigid and are more susceptible to injury, including tears in the annulus and disc herniation.
     The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms.

the ulnar recess and at the distal radioulnar joint space.  There
is no fracture or dislocation present." Tr. 188, 219-220, 223 and
396-397.

On October 12, 2007, Cruz was examined by Dr. Artamonov.
Tr. 236.  Dr. Artamonov reported that Cruz was "doing better as
far as the left upper extremity pain" and that "[i]t appears that
the fracture [is] healing." Id.  A physical examination revealed
"significant tenderness over the sacroiliac joint with partial
pain reproduction on the right side and trochanteric bursa."[26] Id.
However, in contrast to the findings on September 18, 2007, Cruz
had a "grossly negative facet joint loading test[.]" Tr. 236 and
441.

On October 17, 2007, Cruz had an appointment with Mr.
Cirone, Dr. Katz's physician assistant. Tr. 244-245.  Mr. Cirone
reported the following: "Musculoskeletal exam shows some mild
paravertebral and paralumbar tenderness.  There are no
reproducible radicular symptoms either upper or lower.  Left wrist
has tenderness at the distal aspect of the ulna. Neurovascular
status is intact.  Elbow shows some mild tenderness across the

_____

26.  A bursa is "a sac or saclike cavity filled with a viscid
fluid and situated at places in tissues at which friction would
otherwise develop." Dorland's Illustrated Medical Dictionary, 262
(32nd Ed. 2012).  The trochanters are bony processes (structures)
below the head of the femur (thigh bone) to which muscles attach.
See id. at 1970.  Cruz was having pain in the hip area.

medial epicondyle[27] in the area of the ulnar collateral ligament but her range of motion is much improved from last visit." Tr. 244. Mr. Cirone asked Cruz to see a hand surgeon regarding the TFCC tear to determine if surgery was necessary. Tr. 245.

Cruz had an appointments with Dr. Artamonov on October 23 and 30, 2007. Tr. 235 and 438-439. At the appointment on October 23rd Cruz complained of a significant amount of upper extremity and low back pain and Dr. Artamonov reviewed the recent imaging studies with her and outlined her options, including a series of steroid injections. Tr. 235. At the appointment on October 30th, Dr. Artamonov administered an epidural steroid injection into the lumbosacral spine. Tr. 438.

Also, on October 30, 2007, Cruz was seen by George A. Primiano, M.D., a hand surgeon, who concluded that Cruz suffered from a TFCC tear and scheduled her for surgery. Tr. 357-358.

On November 12, 2007, Cruz was examined by Stefano Camici, M.D., a neurosurgeon. Tr. 418-422. A physical examination revealed decreased range of motion in the low back and left arm, cervical and lumbar spinal tenderness, a negative straight leg raising test, an antalgic gait, and left upper extremity weakness.

---

27. The medial epicondyle is a projection at the distal portion of the humerus (upper arm bone) and articulates with the ulna. See Dorland's Illustrated Medical Dictionary, 630 (32nd Ed. 2012).

Tr. 42-421. At the time of this appointment, Dr. Camici did not have the MRI films of Cruz's cervical spine and stated that he could not make an informed neurosurgical decision without viewing them. Id. He noted that he would "call her back after [he] review[ed] the film. Our review of the relevant portions of the record did not reveal that Cruz had subsequent contact with Dr. Camici.

A physical examination of Cruz by Dr. Katz on November 14, 2007, revealed some limitations in the range of motion of the left upper extremity and some tenderness in the bilateral upper extremities. Tr. 242-243.

On November 30, 2007, Cruz had hand surgery performed by Dr. Primiano. Tr. 230-232. Dr. Primiano repaired the TFCC tear with "a suture anchor" and her arm was placed in a splint. Tr. 230 and 232. On December 4, 2007, the splint was removed and Cruz's arm was placed in a cast. Tr. 355.

On December 19 and 26, 2007, Cruz had a series of facet joint nerve blocks administered to her cervical and thoracic spine by Dr. Artamonov. Tr. 435-436.

Over the next several months Cruz continued to receive treatment from Dr. Primiano, Dr. Katz, and Ajay Kumar, M.D., a pain management specialist at Northeastern Rehabilitation & Pain Management Center as well as undergoing numerous physical therapy

sessions.  Tr. 241, 257-260, 269-275, 286-303, 350-351, 353-354, and 430-432.  Dr. Kumar administered several facet joint nerve blocks. Tr. 430-431.  On January 10, 2008, Dr. Primiano removed the arm cast and placed her in volar wrist brace. Tr. 354.  On January 11, 2008, an examination by Dr. Katz revealed limitation of movement and point tenderness in the left upper extremity. Tr. 241.  A physical examination by Dr. Kumar on January 22, 2008, revealed marked tenderness in the bilateral facet joints at the L3 through the L5 levels, markedly painful and restricted range of motion of the lumbosacral spine, tenderness of the bilateral thoracic facet joints at the T3 through T7 levels, mild tenderness along the cervical facet joints at the C4 through C6 levels, and restricted and painful range of motion of the cervical spine. Tr. 432.  Dr. Kumar concluded that Cruz suffered from inter alia

---

28. Myelopathy is defined as "any of various functional disturbances or pathological changes in the spinal cord, often referring to nonspecific lesions in contrast to the inflammatory lesions of myelitis." Dorland's Illustrated Medical Dictionary, 1220 (32nd Ed. 2012).

29. Discogenic disease or degenerative disc disease is disease or degeneration of the intervertebral discs. Degenerative disc disease (discogenic disease) has been described as follows:

> As we age, the water and protein content of the cartilage of the body changes. This change results in weaker, more fragile and thin cartilage. Because both the discs and the joints that stack the vertebrae (facet joints) are partly composed of cartilage, these areas are subject to wear and tear over time (degenerative changes). The gradual deterioration of the disc between the vertebrae is referred to as degenerative disc disease. . . Wear of the facet cartilage and the bony changes of the adjacent joint is referred to as degenerative facet joint disease or osteoarthritis of the spine. Trauma injury to the spine can also lead to degenerative disc disease.
>
> Degeneration of the disc is medically referred to as spondylosis. Spondylosis can be noted on x-ray tests or MRI scanning of the spine as a narrowing of the normal "disc space" between the adjacent vertebrae.
>
> Degeneration of the disc tissue makes the disc more susceptible to herniation. Degeneration of the disc can cause local pain in the affected area. Any level of the spine can be affected by disc degeneration. When disc degeneration affects the spine of the neck, it is referred to as cervical disc disease. When the mid-back is affected, the condition is referred to as thoracic disc disease. Disc degeneration that affects the lumbar spine can cause chronic low back pain (referred to as lumbago) or irritation of a spinal nerve to cause pain radiating down the leg (sciatica). Lumbago causes pain localized to the low back and is common in older people. Degenerative arthritis (osteoarthritis) of the

(continued...)

Id.

On January 23, 2008, Dr. Katz found that Cruz had
limited elbow range of motion: extension 35 degrees normal being 0
degrees, flexion 120 degrees normal being 150 degrees, pronation
70 degrees normal being 80 degrees and supination 45 degrees
normal being 80 degrees. Tr. 239 and 480-481.[30]  On January 31,
2008, Dr. Primiano also found that Cruz had some range of motion
limitations. Tr. 353.

The administrative record contains a medication
"recheck" report dated February 7, 2008, from what appears to be
Mountain Family Care, Tobyhanna, Pennsylvania. Tr. 362 and 371.

_____

29.   (...continued)
          facet joints is also a cause of localized lumbar pain
          that can be detected with plain x-ray testing is also
          a cause of localized lumbar pain.  The pain
          from degenerative disc disease of the spine is usually
          treated conservatively with intermittent heat, rest,
          rehabilitative exercises, and medications to relieve
          pain, muscle spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and
Sciatica, MedicineNet.com, http://www.medicinenet.
com/degenerativedisc/page2.htm (Last accessed September 13,
2013).


30.  Dr. Katz did state that "[f]rom an orthopedic standpoint,
this patient is able to return to work" and "she should begin
physical therapy for active range of motion of the left elbow as
soon as she is cleared by Dr. Primiano[.]" Tr. 240.  However,
that statement has to be considered in light of the totality of
the evidence, including subsequent statement by Dr. Katz.

The record merely gives Cruz's vital signs, a diagnostic impression that she was suffering from insomnia and obsessive compulsive disorder (OCD) and that she was prescribed the antidepressant drug Paxil, the sleep aid Ambien and what appears to be Xanax, which is a drug used to treat, inter alia, anxiety disorders. Tr. 371. The name of the medical provider on the document is illegible.

A progress report of a physical therapy session dated May 5, 2008, states that Cruz had "pain after minimal clinical exercise" at a level of 8 on a scale of 1 to 10. Tr. 265. Cruz's symptoms were unchanged and when she supinated and extended her left hand with ½ to 1 pound weights she had an immediate pain increase. Id. It was noted that most of Cruz's problems were with active flexion and extension. Id. The conclusion of the physical therapist was that Cruz was unable to progress in the strengthening program because of pain. Id.

On May 8, 2008, an examination of Cruz by Dr. Primiano revealed that Cruz's left hand had "full" supination, pronation, flexion and extension but with discomfort in the "area proximal to the distal radial ulnar joint." Tr. 349. Dr. Primiano's impression was that Cruz probably was suffering from "inflammation just proximal to the distal radial ulnar joint" and he injected the area with a corticosteroid pain medication which resulted in

immediate pain relief Tr. 349. Dr. Primiano noted that after the injection Cruz could perform "resistive exercises with her palm up." Id. He advised Cruz to wear a wrist brace for 3 days and wean herself out of it on the 4th day, and to stop physical therapy for a week. Id. Dr. Primiano scheduled a follow-up appointment in 1 month. Id. At an appointment with Dr. Primiano on June 5, 2008, Cruz again complained of similar wrist pain and Dr. Primiano again injected the area with a pain medication, placed her in a wrist brace, advised her to stop physical therapy, and scheduled a follow-up appointment in two weeks. Tr. 348. After a physical examination of Cruz's wrist on June 19, 2008, which revealed wrist tenderness, Dr. Primiano ordered a series of x-rays and an MRI of the wrist. Tr. 347.

An MRI of Cruz's left wrist performed on June 24, 2008, revealed osteoarthritis but because of the metallic orthopedic hardware present in her wrist the ability to evaluate the TFCC was limited. Tr. 308. The MRI did reveal what appeared "to be trace fluid within the distal radial ulnar joint." Id. The x-rays performed on the same day revealed degenerative changes in the "radiocarpal articulation" and "postoperative changes . . . present in the distal ulna." Tr. 307.

Dr. Primiano injected Cruz's wrist with pain medication on June 26 and July 1, 2008, but ultimately determined after

31

examinations of Cruz on July 15 and 24, 2008, that exploratory surgery was necessary which was performed by Dr. Primiano on July 28, 2008. Tr. 213, 227-228 and 343-345. The surgery revealed "osteophytic spurring" in the wrist joint and "a prominent subcutaneous knot, which appeared to be giving her pain." Tr. 227. Dr. Primiano removed the "knot" and also a portion of distal ulna.[31] Tr. 228. After the surgery Cruz was placed in a splint.

At an appointment with Dr. Primiano on July 31, 2008, Cruz complained of "having some pain." Tr. 342. Dr. Primiano removed Cruz's splint and placed her in a long arm cast and scheduled a follow-up appointment in six weeks. Id. That six week appointment occurred on September 9, 2008, and Dr. Primiano's medical notes state in relevant part as follows:

> The patient presents alert, oriented and in no acute distress. . . Her wound is clean. I removed the sutures. I had her do range of motion exercises of her wrist. She had almost full flexion and extension. She lacks just a few degrees of elbow motion. She guards supination, but working with her, she loosened up. . . .
>
> I told the patient to go home and put her wrist brace on, and return to see me in 2 weeks. I told her to put her hand through warm water and gently start range of motion exercises. She is not to do any heavy lifting that might aggravate her wrist.

_____

31. The operative report states that Dr. Primiano removed with a sagittal saw a portion of the distal ulna where it articulated (joined) with the distal radius. Tr. 228.

Tr. 341.

On September 9, 2008, Dr. Katz signed a functional assessment of Cruz in which he stated that Cruz had no ability to perform fine and dextrous movements with the left hand, including picking up a coin from a flat surface, fastening buttons, turning pages, lifting small objects, using push buttons and dialing a telephone. Tr. 252.

At an appointment with Dr. Primiano on September 23, 2008, Cruz reported that she had no wrist pain but "a little bit of bone pain about 3 to 4 inches above the incision site on the ulnar (sic) and also . . . paresthesias over the radial aspect of her wrist." Tr. 339. A physically examination revealed that Cruz was "numb from about the proximal 1/3 of the forearm distally." Id. Cruz had good range of motion of the fingers and almost full range of motion of the wrist, including flexion, extension, supination and pronation. Id. Dr. Cruz's plan was to wean Cruz gradually out of the splint. Id. On October 7, 2008, Dr. Primiano examined Cruz, made similar findings and recommendations and scheduled a follow-up appointment. Tr. 333.

On November 14, 2008, Cruz had an appointment with Dr. Kumar at which Cruz complained of numbness in the left arm and "excruciating headaches . . . all the time." Tr. 577. A physical examination revealed that Cruz had "tenderness on the bilateral

greater and lesser occipital nerve, tenderness on the bilateral C2 and C3 facets and again marked tenderness on the bilateral lower lumbar paraspinal area and severe lumbosacral paraspinal muscle spasm." Id. Dr. Kumar noted that Cruz was wearing a wrist brace on the left hand. Id. Dr. Kumar's diagnostic impression was that Cruz in addition to the previous diagnosis made on January 22, 2008, suffered from cervicogenic headaches and bilateral greater and lesser occipital neuralgia. Id. Dr. Kumar scheduled Cruz "for a series of bilateral greater and lesser occipital nerve blocks." Id.

Cruz had an appointment with Dr. Primiano on November 20, 2008, at which Cruz "continue[d] to [complain of] [] pain in her mid forearm, not particularly around the wrist." Tr. 332. Cruz also reported "swelling to her elbow about 4 days" prior to the appointment. Id. Dr. Primiano also in the medical notes stated that Cruz "recently had a fracture of her elbow from trauma."[32] A physical examination of Cruz's left upper extremity revealed that she had full supination and pronation but had pain "on extremes;" she had good flexion and extension but when lifting straight upward against resistance she had "discomfort at the mid forearm mostly on the ulnar border of her hand" and she had some

---

32. Unless Dr. Primiano is referring to the August 27, 2007, motor vehicle accident, the relevant medical records do not reveal any evidence of a "recent" fracture to the elbow.

"persistent discomfort in the mid portion of her wrist somewhat proximal." Id. Dr. Primiano ordered an MRI of Cruz's forearm. Id.

On December 2, 2008, Dr. Kumar administered to Cruz an occipital nerve block. Tr. 576. Prior to the injections Cruz's pain was 9 on a scale of 1 to 10 and after the injections her pain was a 7. Id.

On January 20, 2009, Cruz had an appointment regarding medication refills with Barbara Riede, a certified nurse practitioner, at Mountain Family Care. Tr. 363-364. The report of this appointment states that Cruz "has had lifelong anxiety and [obsessive compulsive disorder] and has been managed with Xanax 1 mg twice daily, Paxil 10 mg daily and Ambien 10 mg for sleep." Tr. 363. It was stated that Cruz "does not see a mental health provider" and that "[s]he has chronic pain issues and gets her pain meds from her Specialist." Id. A physical examination revealed evidence of a respiratory problem. Id. The diagnostic impression was that Cruz suffered, inter alia, from bronchitis, wheezing, tobacco abuse disorder, anxiety disorder and chronic pain syndrome. Id. Medications were prescribed including Xanax, Paxil and Ambien. Tr. 365.

On February 12, 2009, Cruz had an appointment with Dr. Primiano regarding her left upper extremity. Tr. 331. At this appointment Cruz had good pronation, supination, flexion and

extension. Id. She could pick things up with a hook-type grip (pronated) but not with her arm in the palm up position (supinated). Id. Dr. Primiano stated that Cruz's symptoms were "about the same, [] not any worse, but [] not significantly better[.]" Id.

On February 25, 2009, Cruz had an MRI of the left forearm performed at Pocono MRI which revealed "[n]o abnormal masses or fluid collection" and intact soft tissue planes with no evidence of soft tissue edema which would be indicative of a tear of a muscle, ligament or tendon. Tr. 306. The individual interpreting the MRI, however, noted that a "partial chronic tear of a ligament, tendon, or muscle could not be excluded by the exam." Id.

On March 2, 2009, Cruz had an appointment with Dr. Kumar at which Cruz complained of chronic neck pain and low back pain with radicular symptoms to the "bilateral lower extremity and arm." Tr. 575. Cruz complained of a significant amount of pain in the neck and worsening low back pain with radiation to both of her legs. Id. A physical examination revealed "marked tenderness on the "bilateral cervical facets;" restricted and painful cervical range of motion; a minimally positive Hoffmann sign[33] on the right

_____

33. The Hoffmann's sign is a neurological sign in the hand which is suggestive of spinal cord compression. The test involves
(continued...)

and negative on the left; normal motor strength on the right but testing limited on the left because of pain; marked tenderness of the lower lumbar paraspinal area; tenderness of the bilateral lower lumbosacral facets; painful lumbar flexion and extension; and a positive straight leg raising test in a sitting position. Id. Dr. Kumar ordered an MRI of the lumbar spine, prescribed pain medications and referred Cruz to a neurosurgeon for further evaluation of her neck pain. Id.

On March 5, 2009, Dr. Primiano reviewed the results of the recent MRI with Cruz. Tr. 329. Dr. Primiano conducted a physical examination and stated that Cruz had "virtually a full range of motion of her wrist and elbow in all planes" with "some minor discomfort in the distal radial ulnar joint, but that is markedly improved since her surgery[.]" Id. He further indicated that Cruz can "lift relatively firmly as long as her hand is in the pronated position" and that she can perform almost full supination but cannot do any resistive activity at that point[.]" Id. Dr. Primiano concluded that since Cruz "has such excellent motion in her elbow, wrist and forearm, there is not anything [he]

_____

33.   (...continued)
tapping the nail on the third and fourth finger. "The test is positive for spinal cord compression when the tip of the index finger, ring finger, and/or thumb suddenly flex in response." Hoffmann Sign: Red Flag for Cervical Myelopathy, Orthopod, http://www.eorthopod.com/content/hoffmann-sign-red-flag-for-cervi cal-myelopathy (Last accessed September 11, 2013).

would recommend . . . that would . . . improve her ability to lift heavy object in a supinated position." Id. He advised Cruz to try to do light resistive exercises to see if she can increase her strength in the forearm. Id. Dr. Primiano scheduled a six-month follow-up appointment. Id.

On June 22 and 24, 2009, Cruz visited the emergency department at the Pocono Medical Center regarding back pain which was apparently caused by a recent incident where she "slipped on steps and landed hard on her feet." Tr. 381-383 and 386-389. During the visit on June 22nd Cruz rated her back pain as a 10 on a scale of 1 to 10 but denied neck pain, paresthesias, or extremity weakness. Tr. 387. A physical examination revealed that Cruz had strong pulses in the upper and lower extremities, full range of motion to the neck, no obvious signs of trauma to the neck, a normal inspection of the extremities and normal motor strength and sensory function. Tr. 387 and 389. Cruz did have paraspinal tenderness in the lower back. Tr. 389. Cruz was prescribed pain medications and discharged with instructions to follow-up with an orthopedic specialist and her primary care physician. Id. Similar physical examination findings and assessment were made when Cruz visited the emergency department on June 24th and she was discharged with similar instructions. Tr. 381-383.

Also, on June 24, 2009, Cruz had an appointment with Dr. Kumar. Tr. 574. In the report of that appointment Dr. Kumar states in part as follows:

> Tina-Marie Cruz is here for an emergency follow-up visit. The patient is walking with the help of a cane and she could not even walk by herself and she is being helped by my assistant. Unfortunately, the patient fell on her basement on concrete cement on Sunday. The patient was in excruciating pain. She went to the ER on Monday and as per the patient in the ER, they did not do even an x-ray to rule any fracture and gave her some muscle relaxant and antiinflammatory and discharged her. The patient is in so much pain and she cannot get up or sit up on her own without any help. The patient denies any bowel or bladder involvement. The patient denies any weakness, but the pain in the lower back is excruciating and it is unbearable.

Id. Under the physical examination portion of his medical treatment notes Dr. Kumar stated that Cruz looked like she was in agony and "had tenderness to touch on the sacrum, coccyx, lower part of the lumbar vertebral body and severe lumbosacral paraspinal spasm." Id. From a motor and sensory standpoint, Cruz was neurologically intact but could not "get up on her own" and needed "help in walking[.]" Id. Dr. Kumar ordered a CT scan of Cruz's lumbar spine, sacrum and coccyx and prescribed a lumbosacral brace. Id.

On June 25, 2009, Cruz had an appointment with nurse Riede at Mountain Family Care regarding medication refills for Cruz's anxiety and obsessive compulsive disorder. Tr. 359-360. At the appointment Cruz complained about her recent fall which was

causing ongoing back pain. Id. A general physical examination revealed that Cruz appeared uncomfortable, was wincing in pain with any movement, and was positioned on her side on the exam table and she stated that she could not sit because of back pain. Id. Nurse Riede's diagnostic assessment was that Cruz suffered from anxiety disorder, obsessive compulsive disorder, chronic neck pain and low back pain. Id. Cruz was prescribed Xanax and Ambien and an MRI of the lumbar spine was ordered. Tr. 360. Nurse Riede noted that pain medications would be "ordered only by Pain Management." Id.

On June 30, July 6 and September 2, 2009, Cruz had appointments with Dr. Kumar, the pain management specialist. Tr. 571-573. On June 30th, Dr. Kumar noted that Cruz appeared somewhat better with respect to her pain symptoms but also observed when examining Cruz that Cruz had "marked tenderness in the lower lumbar vertebral area[.]" Tr. 573. On July 6th Dr. Kumar observed "marked tenderness on lower lumbar paraspinal area and mild tenderness on lower cervical area." Tr. 572. Cruz also had a positive Hoffmann sign in the bilateral hands. Id. It was also noted that Cruz's deep tendon reflexes were 3+, brisk[34] and her

_____

34. Brisk reflexes can be considered both normal and abnormal depending on the circumstances. See Chapter 72, Deep Tendon Reflexes, Clinical Methods: The History, Physical, and Laboratory Examinations, 3rd edition, http://www.ncbi.nlm.nih.gov/

(continued...)

40

motor strength was normal (5/5) throughout. Id. Dr. Kumar noted that Cruz had "not been able to get an MRI yet" and again ordered an MRI of the lumbar spine and also ordered an MRI of the cervical spine. Id. He also prescribed the pain medication Vicodin. Id.

Cruz's condition at the appointment on September 2nd was somewhat improved with respect to her pain and she was able to manage her pain with 1 tablet of Vicodin 4 times per day. Tr. 571. It was noted that Cruz was taking Xanax for her anxiety and obsessive compulsive disorder and tramadol, a narcotic medication,[35] for her pain. Id. A physical examination of Cruz was performed and Dr. Kumar reported that Cruz appeared to be "in chronic discomfort." Id. It was also stated that Cruz used a cane to ambulate and was walking with a limp. Id. Cruz had moderate tenderness of the bilateral L3 to S1 facets and mild tenderness of the mid and lower cervical facets. Id. Cruz had a positive Hoffmann sign in the bilateral hands. Id. Deep tendon reflexes were 3+ throughout. Id. Dr. Kumar gave Cruz another prescription

---

34.    (...continued)
books/NBK396/ (Last accessed September 11, 2013). A brisk reflex can be considered normal depending on what it was previously and whether the reflexes are symmetrical. Id. The medical notes appear to suggest by using the plural "reflexes" that they were symmetrically brisk.

35.    Tramadol, Drugs.com, http://www.drugs.com/tramadol.html (Last accessed September 12, 2011).

for an MRI of the lumbar and cervical spines and continued Cruz on the narcotic pain medication Vicodin. Id.

An MRI of the lumbar spine performed on September 10, 2009, revealed at the L5-S1 level mild disc desiccation and a small central disc protrusion measuring .2 centimeters. Tr. 379. There was no spinal or neuroforaminal stenosis[36] at any level. Id.

An MRI of the cervical spine performed on the same day revealed a small central disc protrusion at the C5-C6 level measuring .2 centimeters causing effacement of the anterior thecal sac. Tr. 380. Also, at the C6-C7 level there was "[a] broad based disc bulge . . . present resulting in mild to moderate central canal narrowing and narrowing of the left neural foramen" which had progressed since a prior MRI. Id.

On October 21, 2009, Dr. Kumar administered facet joint nerve blocks to Cruz's lumbar spine at the L4 and L5 levels on the right side which decreased her pain from an 8 to a 4 on a scale of 1 to 10. Tr. 568.

On October 23, 2009, Dr. Kumar wrote a "To Whom It May Concern" letter in which he stated in relevant part as follows: "Tina-Marie is under my care for discogenic back pain, cervical facet syndrome and lumbar facet syndrome. She has C5-C6 central

_____

36. Stenosis is the narrowing of the spinal canal and it can also refer to the narrowing of the neural foramen.

disc protrusion.  The patient is temporarily disabled and cannot sit for prolonged periods of time." Tr. 456 and 567.

On November 4, 2009, Dr. Kumar administered facet joint nerve blocks to Cruz's lumbar spine at the L4 and L5 levels, this time on the left side, which decreased her pain from an 8 to a 4 on a scale of 1 to 10. Tr. 565.  Also, on November 4th Dr. Kumar completed a disability form in which he stated that Cruz was temporarily disabled from November 4, 2009 to May 4, 2010, and that her medical condition precluded any gainful employment. Tr. 566.  He stated that Cruz's primary diagnosis was a herniated nucleus pulposus and discogenic pain. Id.  Although there was a secondary diagnosis noted on the form, we are unable to discern that diagnosis because of the poor quality of the record.  Dr. Kumar did note that his assessment was based on physical examination of Cruz, a review of her medical records and clinical history and appropriate tests and diagnostic procedures. Id.

On November 17, 2009, Cruz commenced receiving treatment for her psychiatric problems, from Arthur Middleton, M.D., a psychiatrist, who at that time was located in Stroudsburg, Pennsylvania.[37] Tr. 462-466.  Dr. Middleton after conducting a

---

37.  Prior to November 17th Cruz's psychiatric problems were treated by her family physician.  A search of the internet reveals that Dr. Middleton is board certified in psychiatry and presently affiliated with Geisinger Wyoming Valley Medical
(continued...)

43

clinical interview with Cruz and performing a mental status examination concluded that Cruz suffered from panic disorder with agoraphobia (DSM Code 300.21)[38] and gave her a Global Assessment of Functioning (GAF) score of 55 to 60.[39] Id. The results of the

37.   (...continued)
Center, in Wilkes-Barre. Geisinger, https://webapps.geisinger.org/ghsnews/articles/PsychiatristjoinsGeisingerW7576.html (Last accessed September 12, 2013).

38.   According to the National Institute of Health's website

> Panic disorder with agoraphobia is an anxiety disorder in
> which there are repeated attacks of intense fear and
> anxiety, and a fear of being in places where escape might be
> difficult, or where help might not be available in case of a
> panic attack. Agoraphobia usually involves fear of crowds,
> bridges, or being outside alone.

A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicince http://www.nlm.nih.gov/medlineplus/ency/article/000923.htm (Last accessed September 12, 2013).


39.   The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination.  The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 21-30
(continued...)

mental status examination were essentially normal. Tr. 465. Dr. Middleton increased Cruz's dosage of Paxil to treat her panic disorder. Tr. 462. He also prescribed the drugs Klonopin[40] and trazodone.[41] Tr. 462.

On December 8, 2009, Dr. Middleton again examined Cruz and reviewed her medications. Tr. 519. Dr. Middleton reported that Cruz described symptoms consistent with panic disorder, generalized anxiety disorder and obsessive compulsive disorder. Id. The results of a mental status examination were essentially normal. Id. Dr. Middleton's diagnostic assessment was that Cruz suffered from panic disorder with agoraphobia and obsessive compulsive disorder. Id. Dr. Middleton increased Cruz's dosage

---

39. (...continued)
represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id.

40. Klonopin (generic name clonazepam), a benzodiazepine drug, is used to treat seizure and panic disorders. Klonopin, Drugs.com, http://www.drugs.com/klonopin.html (Last accessed September 13, 2013).

41. Trazodone (brand name Oleptro) is an antidepressant medication. Trazodone, http://www.drugs.com/trazodone.html (Last accessed September 13, 2013).

of Paxil to treat Cruz's symptoms of obsessive compulsive disorder. Id. Trazodone was discontinued and the drug Remeron[42] added as a sleep aid. Id. Dr. Middleton observed that Cruz walked with a cane. Id.

On December 9, 2009, Cruz was evaluated on behalf of the Bureau of Disability Determination by Tiffany Griffiths, Psy.D., a licensed clinical psychologist, located in Scranton, Pennsylvania. Tr. 468-477. After reviewing medical records, conducting a clinical interview of Cruz and performing a mental status examination, Dr. Griffiths concluded that Cruz suffered from posttraumatic stress disorder, bipolar disorder and obsessive compulsive disorder and gave her a GAF score of 42, representing serious functional limitations. Id.

During the mental status examination, Dr. Griffiths observed that Cruz appeared anxious; Cruz walked with a cane and shifted her posture frequently; Cruz's mood was depressed and anxious; Cruz's affect was tearful at times; Cruz had racing thoughts and her thought content was heavily preoccupied by her obsessive compulsive tendencies; Cruz had great difficulty with the serial 7's task and was only able to recall four letters forward which was indicative of poor concentration; Cruz had poor

_____

42. Remeron (generic names mirtazapine) is an antidepressant medication. Remeron, http://www.drugs.com/remeron.html (Last accessed September 13, 2013).

memory functions, specifically short-term memory; and Cruz's judgment was poor regarding relationships and her insight marginal. Tr. 474. Dr. Griffiths found that Cruz was markedly limited in several work-related mental functional abilities, including interacting appropriately with the public, supervisors and co-workers and responding appropriately to work pressures in a routine work setting. Tr. 469.

On December 22, 2009, Cruz was examined by Sethuraman Muthiah, M.D., on behalf of the Bureau of Disability Determination. Tr. 478-481 and 483-488. After conducting a clinical interview and a physical examination, Dr. Muthiah concluded that Cruz suffered from myofascial pain of the cervical and lumbar regions of the spine, a history of left wrist fracture, obsessive compulsive disorder, anxiety disorder and irritable bowel syndrome. Tr. 488-487. Dr. Muthiah found that Cruz had severe muscle spasm in the cervical region as well as the lumbar region of the spine. Tr. 485. Dr. Muthiah also found that Cruz had limited range of motion of the shoulders and the cervical region. Tr. 480-481. Elbow and wrist range of motion was found to be essentially normal but Dr. Muthiah noted that Cruz had difficulty reaching because of left wrist pain. Tr. 480 and 485. Cruz was "unable to perform knee and hip movements because of her anxiety, mental status and her complaints of pain." Tr. 486. She

also was unable to bend forward apparently because of pain.[43] <u>Id.</u>
In the concluding paragraphs of his report, Dr. Muthiah stated,
inter alia, that Cruz exhibited extreme anxiety; she frequently
hyperventilated; she was not fully cooperative with the
examination and she complained of extreme pain; "she has strong
psychosomatic overlay and full assessment of movement were not
possible;" she has a difficult time sitting and standing; and she
had an antalgic gait. Tr. 487. In a separate statement of Cruz's
ability to perform work-related physical activities, Dr. Muthiah
opined that Cruz could only lift up to 15 pounds and carry 10
pounds frequently. Tr. 478 and 485. He further stated that she
could only stand and walk 45 minutes in an 8-hour workday and sit
45 minutes. <u>Id.</u>

On January 5, 2010, Cruz had an appointment with Dr.
Middleton who after performing a mental status examination and
medication review again found that Cruz suffered from panic
disorder with agoraphobia. Tr. 518. Dr. Middleton did report that
Cruz stated that "she handled the holiday crowds ok" and that she
"talked." <u>Id.</u> Dr. Middleton continued Cruz on Paxil, Remeron and
Klonopin. <u>Id.</u>

---

43. Dr. Muthiah stated that Cruz "refused to do lumbar region
flexion and extension movements" but that her lateral flexion was
15 degrees, normal being 20 degrees. Tr. 481 and 486.

On January 7, 2010, Paul A. Perch, Ed.D., a
psychologist, reviewed Cruz's medical records and concluded
without conducting a clinical interview or observing Cruz that she
only suffered from bipolar disorder, posttraumatic stress disorder
and obsessive compulsive personality disorder and that her
impairments did not meet or equal the criteria of a listed
impairment.  Tr. 495-505.  Dr. Perch found that Cruz was "able to
meet the basic mental demands of competitive work on a sustained
basis despite the limitations resulting from her impairments." Tr.
493.  Dr. Perch further found that Cruz was only markedly limited
in her ability to understand and remember detailed instructions
and carry out detailed instructions and rejected the opinion of
Dr. Griffiths who actually observed Cruz in a clinical setting and
found that Cruz had several additional marked work-related mental
functional limitations.  Id.  A review of the rationale set forth
in Dr. Perch's mental residual functional capacity assessment
reveals that it is conclusory and does not specify the items he
reviewed other than Dr. Griffiths's report.[44] Id.  Furthermore,
there is no indication that he reviewed Cruz's psychiatric

_____

44.  Dr. Perch in a conclusory fashion states that Dr.
Griffiths's assessment was an "overestimate of the severity of
[Cruz's] limitations" and that her "opinion is without
substantial support from the other evidence of record[.]" Tr.
493.  Dr. Perch did not observe Cruz and he does not specify the
other evidence of record.

treatment records from Dr. Middleton and does not refer to Dr. Middleton's opinion that Cruz suffered from panic disorder with agoraphobia. Id.

On January 26, 2010, Cruz had an appointment with Dr. Kumar regarding Cruz's chronic neck and low back pain. Tr. 564. A physical examination revealed that Cruz had (1) marked tenderness of the bilateral facet joints at the L3-L4 level of Cruz's lumbar spine and severe paraspinal muscle spasm; (2) tenderness of the bilateral greater and lesser occipital nerve; and (3) mild tenderness in the bilateral cervical facets. Id. It was also observed by Dr. Kumar that Cruz had tenderness on the right knee medial joint line and a positive McMurray sign.[45] Id. Dr. Kumar could not rule out a medial meniscal tear in the right knee. Id. Dr. Kumar ordered an MRI of the right knee, scheduled Cruz for a series of lumbar facet block injections as well as occipital nerve block injections, and continued Cruz's prescription for Vicodin. Id. Right and left L4/L5 facet joint nerve blocks were administered by Dr. Kumar on February 24 and March 11, 2010 and a

---

45. Between the thighbone and the shinbone are two rings of cartilage called menisci which provide stability and cushion the knee joint, acting as shock absorbers. The McMurray's test or sign is to determine whether there is a meniscal tear. See Dorland's Illustrated Medical Dictionary, 1894 (32nd Ed. 2012).

greater and lesser occipital nerve block on March 23, 2010.  Tr. 561-563.

After performing a medication review and mental status examination on February 2, 2010, a certified registered nurse practitioner (CRNP), apparently associated with Dr. Middleton, found that Cruz suffered from panic disorder and continued Cruz on the medications Paxil, Remeron and Klonopin. Tr. 517.  It was noted that Cruz had an anxious mood and a restricted affect. Id.

From March 2, 2010, through January 4, 2011, Cruz had 12 "Medication Review/Psychotherapy" sessions with either Dr. Middleton or someone associated with him. Tr. 515-516 and 524-533. Cruz was consistently diagnosed with panic disorder and prescribed psychotropic medications, including Paxil. Id.  The dosage of the medications was adjusted on several occasions. Id.  At these sessions, Cruz was frequently found to have an anxious or depressed mood,  a restricted affect and impaired sleep. Id.  She was also frequently found to be overwhelmed, depressed and have partial judgment and insight and assessed as suffering from chronic pain. Id.

An MRI of Cruz's right knee performed on February 4, 2010, revealed the following: "No bony abnormality. No meniscal tear.  No cruciate ligament tear.  Minimal amount of suprapatellar joint fluid." Tr. 586.

On April 28, 2010, Cruz had an appointment with Dr. Kumar regarding her chronic neck pain, back pain and headaches. Tr. 560. She also reported tingling and numbness in the left hand and radiation of her low back pain down her thigh on the left side. Id. Cruz at the time was walking with a cane. Id. A physical examination revealed that Cruz had minimal tenderness in the greater and lesser occipital nerve, a positive Tinel sign[46] on the left hand, marked tenderness and spasms in the bilateral L4-5 facet joints and a positive slump test[47] on the left. Dr. Kumar ordered an electromyogram(EMG)[48] of the upper and lower extremities and prescribed Percocet, a narcotic pain mediation. Tr. 560.

---

46. A positive Tinel's sign suggests an irritated nerve. It is a test for carpal tunnel syndrome. Carpal Tunnel Syndrome, About.com Orthopedics, http://orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel_2.htm (Last accessed September 13, 2013).

47. The slump test is used to diagnose the source of low back pain. It is used to see if there is a disc herniation causing a pinched sciatic nerve.

48. "An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction.. . . An EMG is done to: ♦ Find diseases that damage muscle tissue, nerves . . . These problems may include a herniated disc . . . ♦ Find the cause of weakness, paralysis, or muscle twitching. Problems in a muscle, the nerves supplying a muscle, the spinal cord or the area of the brain that controls a muscle can cause these symptoms. The EMG does not show brain or spinal cord disease." Electromyogram (EMG) and Nerve Conduction Studies, WebMD, http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies (Last accessed September 13, 2013).

An EMG of the upper extremities performed on May 17, 2010, revealed that Cruz had nerve root irritation of an acute nature at the C6 level of the cervical spine on the left. Tr. 555. An EMG of the lower extremities performed on June 2, 2010, revealed nerve root irritation of an acute nature at the S1 level of the lumbosacral spine. Tr. 579.

On June 10, 2010, Dr. Kumar examined Cruz and made finding similar to those made on April 28th and continued Cruz's prescription for Percocet. Tr. 559.

At an appointment with Dr. Kumar on July 1, 2010, there was no change in Cruz's medical condition. Tr. 558. She still suffered from chronic neck and back pain and headaches. Id. The report of this appointment reveals that Cruz was walking with an antalgic gait and a sensory examination of a lower extremity revealed decreased sensation to light touch on the right L5-S1 distribution.[49] Id. Dr. Kumar discontinued the prescription for Percocet and prescribed the narcotic pain medication Oxycodone. Id. Dr. Kumar told Kumar that he was "leaving the practice" and

---

49. A dermatome (distribution) is an area of the skin mainly supplied by a single spinal nerve, There are 8 such cervical nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem with a particular nerve root should correspond with a sensory defect, muscle weakness, etc., at the appropriate dermatome. See Stephen Kishner, M.D., Dermatones Anatomy, Medscape Reference, http://emedicine.medscape.com/article/1878388-overview (Last accessed February 2, 2012).

that the next physician possibly could try "a trial of transforaminal injections." Id.

On August 11, 2010, Cruz had an appointment with Matt Vegari, M.D., a neurologist located in East Stroudsburg. Tr. 549.[50] The report of this appointment indicates that Cruz suffered from chronic neck and back pain. Id. A physical examination revealed that Cruz had tenderness of the lower lumbar facet joints with a positive slump test bilaterally. Id. Furthermore, Cruz's cervical range of motion was "impaired at 30 degrees in both directions." Id. An MRI of the cervical spine was ordered and she was continued on the drug Oxycodone for pain. Id.

An MRI of the cervical spine performed on September 14, 2010, revealed the following: "[At the C6-C7 level] a broad-based disc bulge in combination with posterior osteophyte ridging results in moderate central canal narrowing and is notable for interval increase in the degree of central canal narrowing as compared to the prior examination." Tr. 557.

At an appointment with Dr. Vegari on September 15, 2010, a physical examination revealed cervical and lumbosacral paraspinal muscle spasms and limitation of motion of the cervical

_____

50. It is not clear whether Cruz was examined by Dr. Vegari or Dr. Vegari's physician assistant or both of them.

spine.[51] Tr. 548.   There was also tenderness at the lower lumbar facet joints and the sacroiliac joint. Id.  It was noted that Cruz's gait was antalgic and she walked with a cane. Id. Furthermore, she appeared to be in "chronic pain and discomfort as well as an acute degree of pain and discomfort resulting in shifting in the chair." Id.

An MRI of the lumbar spine performed on November 2, 2010, revealed disc dessication, a central disc protrusion at the L5-S1 level and a disc bulge at the L4-L5 disc. Tr. 550.  There was no neural foraminal or spinal canal narrowing. Id.

On January 5 and February 7, 2011, Cruz had appointments with Nathan P. Carr, a physician assistant employed by Dr. Vegari. Tr. 543-544 and 546-547.  The medical records of these two appointments were electronically signed by Dr. Vegari. Tr. 544 and 547. The physical examination of Cruz on January 5th revealed that Cruz had cervical and trapezius muscle spasm, limitations of neck movement to the right and the left, tenderness of the facet joints at the C4 through C6 levels, multilevel cervical root tenderness, moderate thoracic paraspinal muscle spasm, tenderness of the facet joints at the T5 through T8 levels of the thoracic spine, lumbosacral paraspinal muscle spasm, lower lumbar facet joint tenderness, sacroiliac joint tenderness, slightly decreased grip

---

51.  Id.

strength, brisk and hyperactive reflexes throughout, bilaterally diminished ankle reflexes, bilaterally positive Tinel and Phalen signs,[52] and bilaterally positive Hoffmann sign. The diagnostic assessment was that Cruz suffered from (1) intervertebral cervical disc disorder with myelopathy; (2) intervertebral thoracic disc disorder with myelopathy; (3) displacement of lumbar intervertebral disc[53] without myelopathy; (4) derangement of anterior horn of medial meniscus;[54] and (5) joint pain in the forearm and wrist. Tr. 547. Similar findings and the same diagnostic assessment were made at the appointment on February 7, 2011. Tr. 544.

On February 9, 2011, Dr. Vegari completed a document entitled "Spinal Impairment Questionnaire." Tr. 535-534. In that document Dr. Vegari stated that he treats Cruz on at least a bimonthly basis; his diagnostic impression was that Cruz suffered from cervical herniated discs with spinal cord impingement and left C6 root irritation and herniated discs in the lumbar spine;

---

52. A positive Phalen sign suggests that Cruz suffered from carpal tunnel syndrome. See Dorland's Illustrated Medical Dictionary, 1714 (32nd Ed. 2012).

53. Disc displacement means that an intervertebral disc has fallen out of its proper alignment.

54. Derangement with respect to the knee is defined as "partial dislocation . . . marked by great pain and spasm of the muscles." Dorland's Illustrated Medical Dictionary, 493 (32nd Ed. 2012).

Cruz's prognosis was fair to guarded; Cruz suffered from limited range of motion in the cervical and lumbar spine, including limitations with respect to forward and lateral bending; Cruz suffered from facet joint tenderness and paraspinal muscle spasm in the cervical and lumbar spines; Cruz suffered from decreased ankle reflexes; and Cruz had an abnormal gait, cervical and lumbar trigger points and positive straight leg raising tests. Tr. 535-536. Dr. Vegari stated that it was his opinion that the MRIs showed herniated discs and an EMG revealed left C6 root irritation. Tr. 537.

According to Dr. Vegari, Cruz's primary symptoms are neck and low back pain with radicular pain into her left arm and both legs, as well as fatigue and drowsiness from Oxycodone and Flexeril. Tr. 537. Dr. Vegari stated that the nature of the pain was sharp, stabbing and burning; and the frequency of the pain was daily. Id.

Dr. Vegari did not specify Cruz's ability to sit, stand and walk but indicated that Cruz could frequently lift/carry 10 pounds and occasionally 20 pounds. Tr. 539. Dr. Vegari, however, stated that Cruz could never bend or stoop and had a limited ability to push or pull Tr. 541. Dr. Vegari opined that Cruz's pain would periodically to frequently interfere with her attention and concentration. Tr. 539. He further indicated that Cruz's

condition would interfere with her ability to keep the neck in a constant position, such as looking at a computer screen or looking down at a desk, and that she would have "good days" and "bad days" and miss on average about two to three workdays per month as a result of her impairments. Tr. 540. If Dr. Vegari's assessment was accepted, Cruz would be unemployable.[55]

## Discussion

The administrative law judge at step one of the sequential evaluation process found that Cruz had not engaged in substantial gainful work activity since her alleged onset date of August 27, 2007. Tr. 30.

At step two, the administrative law judge found that Cruz suffered from the following severe impairments: "degenerative disc disease of the lumbar and cervical spine with left C6 and right S1 root irritation, degenerative joint disease of the bilateral knees and left wrist/elbow, obesity, bipolar disorder, chronic pain syndrome, posttraumatic stress disorder and obsessive compulsive personality disorder." Tr. 31. The administrative law judge did not address whether or not Cruz suffered from

---

55. Vocational experts frequently testify that missing more than 2 days per month would make an individual unemployable. Furthermore, Social Security Ruling 96-9p provides: "A complete inability to stoop significantly erodes the unskilled occupational base and a finding that the individual is disabled would ordinarily apply . . . ."

cervicogenic headaches, degenerative disc disease of the thoracic spine, irritable bowel syndrome or panic disorder with agoraphobia.

At step three of the sequential evaluation process the administrative law judge found that Cruz's impairments did not individually or in combination meet or equal a listed impairment. Tr. 31.

In addressing step four of the sequential evaluation process in her decision, the administrative law judge found that Cruz could not perform her past relevant unskilled, medium to heavy work but that she could perform a limited range of unskilled, light work "treated as sedentary." Tr. 33 and 39. The administrative law judge found that Cruz had the ability to lift 20 pounds occasionally and 10 pounds frequently but that Cruz was limited to the sitting, standing and walking requirements of sedentary work. Id. Also, the administrative law judge found that Cruz was

> limited to occupations that require no more than occasional climbing, balancing, and stooping but never on ladders, kneeling, crouching or crawling. The claimant has a left non-dominant extremity overhead reach limitation and the need to avoid temperature extremes, humidity, vibrations, and hazards. Lastly, the claimant is limited to simple, routine, repetitive tasks that are low stress defined as only occasion decision-making and changes in the

work setting with no interaction with the public.[56]
Id. In arriving at this residual functional capacity the administrative law judge found that Cruz's statements about her functional limitations were not credible and she also rejected the functional assessments of Dr. Middleton, Dr. Muthiah, Dr. Griffiths and Dr. Vegari, all of whom had contact with Cruz, and instead relied exclusively on and her own lay analysis of the medical records and the testimony Cruz and the assessment of Dr. Perch, who did not examine Cruz or specify the medical records he was relying on other than Dr. Griffiths's report.

At step five, the administrative law judge based on the above residual functional capacity and the testimony of a vocational expert found that Cruz had the ability to perform unskilled work as an assembler, and a surveillance system monitor, and that there were a significant number of such jobs in the economy.[57] Tr. 28.

---

56. The administrative law judge did not include any limitation with respect to Cruz's interaction with co-workers or supervisors.

57. The administrative law judge did not identify the region of the economy or specifically state that there were a significant number of jobs. She merely noted that there were 1300-1400 assembler positions and 100-200 surveillance system monitor positions. Tr. 40. The vocational expert also did not identify the geographic region of the economy he was relying on.

Cruz argues that the administrative law judge erred by failing to appropriately evaluate the medical evidence, including the opinions of the treating physicians, and the credibility of Cruz. Those arguments have substantial merit.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then when setting a claimant's residual functional capacity considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520©. If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two. However, all of the medically determinable impairments both severe and non-severe must be considered at step two and then at step four when setting the residual functional capacity. The social security

regulations mandate such consideration and this court has repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D.Pa. September 27, 2011)(Caputo, J.); 20 C.F.R. §§ 416.923 and 416.945(a)(2).

The administrative law judge failed to adequately consider whether Cruz suffered from cervicogenic headaches, degenerative disc disease of the thoracic spine, irritable bowel syndrome or panic disorder with agoraphobia.

The failure of the administrative law judge to find that those conditions were medically determinable impairments, or to give an adequate explanation for discounting them, makes her decisions at steps two and four of the sequential evaluation process defective.

The error at step two of the sequential evaluation process draws into question the administrative law judge's residual functional capacity determination and assessment of the credibility of Cruz. The administrative law judge found that Cruz's medically determinable impairments could reasonably cause Cruz's alleged symptoms but that Cruz's statements concerning the intensity, persistence and limiting effects of those symptoms were

not credible. This determination by the administrative law judge was based on an incomplete and faulty analysis of all of Cruz's alleged impairments. The error at step two is a sufficient basis to remand this case to the Commissioner for further proceedings.

The administrative law judge rejected the opinions of several treating physicians. The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). When the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Id. In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of

the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In this case the administrative law judge relied on the opinion of a non-treating, non-examining physician and her own lay analysis of the medical records to reject the opinions of a treating physicians. The administrative law judge did not give an adequate reason for rejecting the opinions of Dr. Middleton and Dr. Vegari as well as Dr. Muthiah and Dr. Griffiths. Dr. Vegari's opinion would preclude full-time employment. Dr. Griffiths found that Cruz had several marked mental limitations, including in her ability to interact with co-workers and supervisors. The administrative law judge did not include those limitations in her residual functional capacity assessment or give an explanation for not including them.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will be entered.

_William W. Caldwell_
WILLIAM W. CALDWELL
United States District Judge

Dated: September 17, 2013

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TINAMARIE CRUZ,                    :
                                   :
          Plaintiff                :    No. 1:12-CV-00135
                                   :
     vs.                           :    (Judge Caldwell)
                                   :
CAROLYN W. COLVIN, ACTING          :
COMMISSIONER OF SOCIAL             :
SECURITY,                          :
                                   :
          Defendant                :

ORDER

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1. The Clerk of Court shall enter judgment in favor of Tinamarie Cruz and against the Commissioner of Social Security, as set forth in the following paragraph.

2. The decision of the Commissioner of Social Security denying Tinamarie Cruz disability insurance benefits and supplemental security income benefits is vacated and the case remanded to the Commissioner of Social Security to:

2.1 Conduct a new administrative hearing and appropriately evaluate the medical evidence and the credibility of

FILED
HARRISBURG

SEP 17 2013

MAR
Pr
Deputy

Tinamarie Cruz.

      3.   The Clerk of Court shall close this case.

_William W. Caldwell_
WILLIAM W. CALDWELL
United States District Judge

Dated: September 17 , 2013